2012 Ark. App. 617

**Bobby McMULLEN and Estate of William E. McMullen, Deceased, Appellants**

v.

**HEALTHCARE STAFFING ASSOCIATES, INC. and Arkansas Elder Outreach of Little Rock, Inc., Appellees.**

No. CA 11–1136.

Court of Appeals of Arkansas.

Oct. 31, 2012.

405

Wilkes & McHugh, P.A., Little Rock, by: Melody H. Piazza and Deborah Truby Riordan, for appellant.

Anderson, Murphy & Hopkins, LLP, Little Rock, by: Scott D. Provencher and Mark D. Wankum, for appellee.

CLIFF HOOFMAN, Judge.

Appellant Bobby McMullen, as personal representative of the estate of William E. McMullen, deceased, and on behalf of the wrongful-death beneficiaries, appeals from the grant of summary judgment in favor of appellee Healthcare Staffing Associates, Inc. (HSA). Appellant argues that a material question of fact remains as to whether the borrowed-servant doctrine applies and thus, whether HSA is free from liability for the negligence of its loaned employees. We agree that reversal is warranted.

William E. McMullen was a resident of Malvern Nursing Home from December 31, 2003, until November 16, 2005. On August 4, 2006, appellant filed suit against Malvern Nursing Home Partnership, LTD; Arkansas Elder Outreach of Little Rock, Inc. d/b/a Malvern Nursing Home (AEO); and HSA alleging negligence in the care of McMullen, negligence under the Medical Malpractice Act, violations of the Long–Term Care Residents' Rights Statute, and civil liability for felony neglect of an endangered or impaired adult. Each defendant filed a separate answer to the complaint denying liability. On March 13, 2007, the trial court granted appellant's motion for voluntary non-suit as to Malvern Nursing Home Partnership, LTD. On September 17, 2009, the trial court granted summary judgment to AEO based on the charitable-immunity doctrine; however, the court of appeals reversed this order on March 2, 2011. *McMullen v. Ark. Elder Outreach of Little Rock, Inc.,* 2011 Ark. App. 156, 2011 WL 715014.

On December 4, 2009, HSA filed a motion for summary judgment. HSA claimed, in part, that it was not involved in budgeting, staffing, or policies and procedures at the nursing home and that it was not liable for the negligence of the direct caregivers under the borrowed-servant doctrine. Appellant filed a response to HSA's motion, arguing, in part, that HSA was one of several for-profit corporations that functioned as a single-business enterprise in operating Malvern Nursing Home; that HSA's stated purpose was a sham because it did not provide healthcare benefits to the majority of its employees; that HSA was involved in decisions pertaining

to budgeting, staffing, and policies and procedures for the nursing home; that the borrowed-servant doctrine did not apply because there was no dual-employment situation; and that alternatively, the borrowed-servant doctrine should not absolve HSA of all liability given the unique nature of its business. HSA filed a reply brief in support of its motion for summary judgment, arguing that appellant had failed to meet proof with proof.

Materials presented to the trial court in connection with the motion and response provided the following background information. Douglas Walsh testified in his deposition that he worked for Healthcare Financial Advisors (HFA), which provided financial and accounting services to nursing homes operated by Southern Key Investments (SKI), the general partner of various limited partnerships formed to acquire nursing homes. According to Walsh, it became too expensive in 2002 for the nursing homes to maintain professional liability insurance. To avoid this insurance problem, the limited partnerships leased the nursing homes to the newly-created AEO, which was formed as a non-profit to be exempt from tort liability. Walsh testified that around 2003, HSA was formed by the same people that formed HFA to lease direct-care staff to the nursing homes and provide benefits to these employees, which would be too expensive if the employees were all employed by AEO. In 2004 and 2005, AEO paid HSA more than $3 million and paid HFA more than $180,000. HSA and HFA share the same address in Baton Rouge, Louisiana.

Chris McMorris stated in his affidavit that he was a part-owner and officer of HSA. He said that the purpose of HSA was to pool a large number of employees to provide affordable health benefits that would otherwise be unavailable for direct caregivers in the nursing home setting and that HSA performs human-resources services for these employees, including the administration of health benefits. He said that AEO hires the HSA employees, supervises them, and has the authority to conduct employee reviews and terminate them. McMorris said that HSA does not supervise the employees on a daily basis or train them for work at a particular facility. He said that HSA was not involved in the drafting of any facility's polices and procedures, in the development of their budget, in determining staffing needs, or in the day-to-day operations and management of the nursing home.

Jayne West, the administrator of Malvern Nursing Home, testified in her deposition that she had full authority to run the nursing home and was responsible for ensuring that policies and procedures were implemented correctly. West testified that the director of nursing, an employee of AEO, was the direct supervisor of the direct-care staff and was the person who determined staffing needs. This was confirmed by the testimony of the current director of nursing, Jean Collins Jensen. West said that the direct-care staff did not have a direct supervisor in the corporate office, that written evaluations of those employees were not sent to corporate, and that she had the authority to hire and fire those employees without speaking to the corporate office. She said that the nursing home had budget meetings normally twice a year, that the "financial employees from Baton Rouge" were involved, and that McMorris conducted the meetings. Walsh testified that the administrators of the nursing homes worked on a regular basis with HFA to develop the budgets, which were reviewed by the AEO board. He testified that one member of the board was a corporate nurse who helped train the nursing staff.

After a hearing, the trial court entered an order on July 27, 2011, granting HSA's motion for summary judgment. The order included the following findings:

The Court concludes that the borrowed servant doctrine applies without question to the fact situation presented herein.

Utilizing separate legally sanctioned and operated corporate structures that insulate persons and other corporations from liability, share office buildings and addresses, and have some, possibly even all, the same persons serving as officers or directors of the various entities that provide separate services in a related broad field, such as nursing home care, does not defeat the borrowed servant rule or otherwise create a factual basis for piercing the corporate veil.

*Steinert v. Arkansas Workers' Compensation Com'n,* 2009 Ark. App. 719, [361] S.W.3d [858] (2009), is readily distinguishable from the facts of this case and is not applicable to Healthcare Staffing Associates and its impliedly associated corporations.

The testimony of Mrs. West in the portions of her deposition provided in Plaintiff's Response raises no genuine issue that Healthcare Staffing Associates was involved in budgeting, staffing, scheduling, or other day to day operations of the nursing home.

The contract between Defendant Healthcare Staffing Associates and Arkansas Elder Outreach is clear in its terms that Healthcare Staffing Associates' obligation is to provide qualified medical employees in the quantity and type as needed and requested by Arkansas Elder Outreach. If any of the duties under the contract were not fulfilled, that would be a matter between those parties.

Appellant obtained a Rule 54(b) certificate and filed a timely notice of appeal.

On appeal, appellant argues that the trial court erred in granting summary judgment to HSA because a genuine issue of material fact remained as to the application of the borrowed-servant doctrine. Our standard of review for summary judgment has been often stated as follows:

Summary judgment is to be granted by a trial court only when it is clear that there are no genuine issues of material fact to be litigated and the moving party is entitled to judgment as a matter of law. Once a moving party has established a prima facie entitlement to summary judgment, the opposing party must meet proof with proof and demonstrate the existence of a material issue of fact. After reviewing undisputed facts, summary judgment should be denied if, under the evidence, reasonable minds might reach different conclusions from those undisputed facts. On appeal, we determine if summary judgment was appropriate based on whether the evidentiary items presented by the moving party in support of its motion leave a material question of fact unanswered. This court views the evidence in a light most favorable to the party against whom the motion was filed, resolving all doubts and inferences against the moving party. Our review is not limited to the pleadings, as we also focus on the affidavits and other documents filed by the parties.

*Seth v. St. Edward Mercy Med. Ctr.,* 375 Ark. 413, 416, 291 S.W.3d 179, 182 (2009).

Under the doctrine of respondeat superior, an employer may be held vicariously liable for the tortious conduct of an agent if the evidence shows that such conduct was committed within the scope of the agent's employment. *St. Joseph's Reg'l Health Ctr. v. Munos,* 326 Ark. 605,

934 S.W.2d 192 (1996). The issue here is whether the allegedly negligent caregivers were acting within the scope of their employment with AEO or HSA. HSA argued in its motion for summary judgment that, pursuant to the borrowed-servant doctrine, the nursing home staff was employed by AEO at the time of their tortious conduct. Our supreme court has defined the borrowed-servant doctrine as follows:

> [O]ne who is the general servant of another may be lent or hired by his master to another for some special service, so as to become as to that service the servant of such third party. The test is whether, in the particular service which he is engaged to perform, he continues liable to the direction and control of his master or becomes subject to that of the party to whom he is lent or hired.

*St. Joseph's,* 326 Ark. at 612, 934 S.W.2d at 195 (citing *Ark. Nat'l Gas Co. v. Miller,* 105 Ark. 477, 482, 152 S.W. 147, 149 (1912)). In *George's, Inc. v. Otwell,* the supreme court held that the following instruction properly instructed the jury as to the borrowed-servant doctrine:

> One who is in the general employment and pay of another may be loaned or hired by his general or original employer to a third party for the performance of some particular services for the third party. If the original or general employer, and not the third party, retains the right to control and direct the conduct of the employee in the performance of such services, then the original or general employer will be treated as his employer, with respect to such services. On the other hand, if the third party to whom the employee is loaned or hired has the right to direct and control the conduct of the employee in the performance of such services, then the third party would be considered his employer.

282 Ark. 152, 153, 666 S.W.2d 406, 407 (1984). The most significant question regarding a loaned employee is which company has direction and control of the employee. *St. Joseph's, supra* (citing *Cash v. Carter,* 312 Ark. 41, 847 S.W.2d 18 (1993); *George's, supra*). The *St. Joseph's* court held that "[o]rdinarily the question whether the general or special employer ⌞7had the right of control and thus was the employee's master, presents an issue of fact for the jury." *St. Joseph's, supra* (quoting *Watland v. Walton,* 410 F.2d 1, 3—4 (8th Cir.1969)). However, "where all of the evidence is in one direction and there is no rational basis for reasonable minds to differ as to the status of the servant the issue is one of law for the court to resolve." *Id.*

■ Appellant argues that there is a question of material fact regarding HSA's right to control the employees who worked at the nursing home because all of the testimony in Chris McMorris's affidavit is refuted by other evidence in the record. HSA argues that the trial court correctly applied the borrowed-servant doctrine because AEO exercised complete and total control over the borrowed employees, and appellant failed to meet proof with proof.

Appellant argues that West's testimony refutes the claim that HSA cannot be liable because it was not involved in the operation of the nursing home. West testified that she regularly spoke with McMorris by phone and at the facility and that his role with regard to her was finances, budgets, and staffing as it related to budgets. West also testified that "Baton Rouge," where HSA is based, decides that the nursing home will hire employees from HSA. Appellant argues that a corporation's control over budgeting and staffing, when shown to have impacted care and treatment of a nursing home resident, is sufficient to establish liability. *See Rose Care, Inc. v. Ross,* 91 Ark.App. 187, 209

S.W.3d 393 (2005). HSA argues that any conversations McMorris had with West about finances and budgets was done in his capacity as an officer and principal of HFA, not HSA. HSA points out Walsh's testimony that AEO and HFA worked on budgets, not HSA.

Although HSA contends that McMorris was an officer and principal of HFA, there was no evidence of this fact presented to the trial court. Assuming that he was an officer of HFA, the work he did on their behalf does not establish liability for HSA. *See K.C. Props. of N.W. Ark., Inc. v. Lowell Inv. Partners, LLC*, 373 Ark. 14, 32, 280 S.W.3d 1, 16 (2008) ("All corporations, regardless of the fact that the holders of stock and the officers of the corporation are identical, are separate and distinct legal entities; and it follows that, in the absence of facts on which liability can be predicated, one such corporation is not liable for the debts of another."). However, as an officer of HSA, McMorris's control over the management of the nursing home could bar the application of the borrowed-servant doctrine. We hold that a factual issue exists as to whether HSA retained control over the nursing home caregivers through McMorris's involvement with West and the nursing home's budget.

Appellant also points to testimony regarding a corporate nurse in arguing that HSA retains control over its loaned employees. Walsh testified in his deposition on January 29, 2009, that "the makeup of our [AEO's] board presently" included a corporate nurse, Robin Merkel, who was an ad hoc, non-voting member. When asked for whom Merkel worked, the following exchange occurred:

A She works for the—to the nonprofit. She floats between each of the facilities. She helps train and guide our nursing staff in compliance, assists in any and all surveys, and institutes programs and policies, if you will, protocols to insure compliance.

Q And is Ms. Merkel an independent contractor or does she work for a company?

A She actually works for Staffing.

Q For Healthcare Staffing?

A Healthcare Financial—Staffing, yes.

Appellant argues that *Scott v. Central Arkansas Nursing Centers, Inc.*, 101 Ark. App. 424, 278 S.W.3d 587 (2008), is instructive as to the potential liability of a consulting nurse's employer. In *Scott*, this court reversed the directed verdict in favor of a defendant corporation, NCI, which provided consulting services to the nursing home. At trial, a nurse testified that she was employed by NCI during the relevant time period and would assist nursing homes with "assuring that they had systems and processes in place to provide good quality of care." The nurse had reviewed surveys reflecting inadequate staffing with the director of nursing and had made suggestions as to residents' care. This court held that the proof established that NCI was directly involved in the provision of care at the nursing home during the relevant time period. HSA argues that there was no proof that Merkel filled this role during McMullen's residency and that even if her conduct was considered, she was another borrowed employee for whom HSA is not vicariously liable.

Based on Walsh's testimony, there is evidence that HSA exercised some control over the direct caregivers through the employment of a corporate nurse. Although the time period of Merkel's employment was not defined, when we view the evidence in the light most favorable to the party against whom the motion was filed, there is a question of fact remaining as to

whether a corporate nurse trained the direct caregivers or instituted policies and procedures during McMullen's residency.

The proof presented to the trial court leaves a material question of fact unanswered as to the control of the direct caregivers; thus, summary judgment based on the borrowed-servant[10] doctrine was not appropriate. Accordingly, we reverse and remand. Because of this holding, we find it unnecessary to address appellant's remaining arguments as to why the borrowed-servant doctrine should not apply.

Reversed and remanded.

VAUGHT, C.J., and ROBBINS, J., agree.